UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CARL R. HAYES,

     Plaintiff,

v.                                                                              CASE NO. 8:12-cv-2038-T-23TGW

CITY OF TAMPA, et al.,

     Defendants.

_____/

## **ORDER**

Carl R. Hayes sues Tampa police officer Donald Miller under 42 U.S.C. § 1983 and the Fourth and the Fourteenth Amendments to the Constitution for false arrest (Count I) and for excessive force (Count II).  (Doc. 2 at 8-12)  Also, Hayes sues Miller under state common law for assault and battery (Count III).  (Doc. 2 at 12-13) Hayes sues the City of Tampa under Section 1983 for "failure to implement and enforce appropriate policies, customs, and practices" in violation of the Fourth and the Fourteenth Amendments (Count IV).  (Doc. 2 at 13-19)  Miller moves (Doc. 16) for summary judgment on Counts I through III, and the City moves (Doc. 17) for summary judgment on Count IV.

# FACTS

*1. The November 26, 2008 Incident*

On November 26, 2008, Hayes appeared before the Code Enforcement Board to appeal a code enforcement hearing master's notice of violation and fine.  (Doc. 2 at 3; Doc. 16 at 2)  The City assigned Miller, a Tampa police officer, to provide "security and other services in a bailiff-type capacity" at the board meeting.  (Doc. 2 at 3; Doc. 16 at 2-3)  After Hayes's presentation, the Board invited Aminta Owen, Hayes's neighbor and a code enforcement officer, to address the Board.  (Doc. 2 at 4; Doc. 16 at 3)  As Owen began her presentation, Hayes spoke in a loud voice, interrupting Owen, and exclaimed that the neighbors' complaints were racially motivated.  (Doc. 2 at 4; Doc. 16 at 3)

When Hayes interrupted Owen, Kevin Amos, another code enforcement officer, left the hearing room and alerted Miller.  (Doc. 16 at 3-4)  Miller entered and escorted Hayes from the hearing room.  (Doc. 2 at 4; Doc. 16 at 4)  Once outside, Hayes and Miller scuffled, during which Miller twice used a taser on Hayes – once by deploying taser prongs and once by using the taser in stun-gun mode.  (Doc. 2 at 5-6; Doc. 16 at 4-5)  Miller and a second officer handcuffed Hayes.  (Doc. 2 at 6; Doc. 16 at 5)

Miller charged Hayes with battery on a law enforcement officer, resisting arrest without violence, and trespassing.  (Doc. 16 at 5)  The state later dropped the charges.  (Doc. 16 at 5)

*2. Miller's History*

As of the November 26, 2008 incident, Miller had served as a Tampa police officer for fourteen years.  (Doc. 17 at 6)  "Miller was initially certified with the taser in August 2004 and received continued taser training in 2006, 2007, 2008, 2010, and 2011."  (Doc. 17 at 12)  Miller had thirteen pre-incident complaints against him, of which three involved use-of-force.  (Doc. 17 at 7)  A 2006 complaint was sustained; Miller was disciplined (1) for "use-of-force" – specifically, "physical countermeasures, use of leg restraints and a drive stun from [a] taser" against "an aggressive DUI arrestee" – and (2) for "misuse of office equipment" because Miller "excessively fired his taser from 2004 and [sic] 2006."  (Doc. 17 at 7; Doc. 21 at 14)

*3. The City's Policy on Tasers*

The City adopted the use of the taser "as an intermediate weapon for . . . its police officers in 2003-2004.  In June 2004, the City promulgated [Section 521.2, Standard Operating Procedure,] which set out the agency's policy on the use of the [taser]."[1]  (Doc. 17 at 11 (footnote omitted))  "Officers . . . continually receive roll call training and annual in-service taser training."  (Doc. 17 at 12)  "The Department's legal advisor has also addressed taser usage through legal bulletins[,]

---

[1] "Only sworn personnel who have successfully completed an agency approved course of instruction on the use of the [taser are] issued [a taser]." (Section 521.2.V.I.1, Standard Operating Procedure; Doc. 17-12 at 6) "The deployment of [a taser] on an individual requires the notification of a supervisor." (Section 521.2.V.K.1.e.1, Standard Operating Procedure; Doc. 17-12 at 8) Certain patterns of taser use are submitted to Internal Affairs for review. (Section 521.2.V.K.1.e.4, Standard Operating Procedure; Doc. 17-12 at 9)

which aid officers in their decision about whether, and under what circumstances, to use a taser." (Doc. 17 at 12)

In general, Section 1601, Manual of Regulations, prohibits excessive force and Section 1602, Manual of Regulations, requires officers to report a use of force.[2] (Doc. 17-6 at 10) Section 538, Standard Operating Procedures, requires that "the use of force in any situation be limited to the force . . . which is needed to overcome specific resistance by the subject." (Doc. 17-7 at 1)

The City maintains a High Liability Training Evaluation Committee (formerly known as the Use of Force and Training Evaluation Committee), which "functions in an advisory capacity to assist with training and the development of policy."

---

[2] The Manual of Regulations provides:

> 1602. Use of Force: Department employees shall not use excessive force in making an arrest or in dealing with a prisoner or any other person.

> 1603. Reporting Use of Force: Department employees shall report each instance of use of force or deployment of any less than lethal system, which shall include the pointing of a weapon and submit a written report or recorded statements containing detailed information relating to the type and degree of force used. Use of force reports will be submitted no later than the end of the shift in which the force was used. Use of force incidents that occur in an extra-duty capacity will be reported no later than the end of the extra-duty assignment. Officers utilizing force in connection with an off-duty exercise of police authority will submit proper reports before returning to off-duty status. Officers shall immediately report and document as required any injury or complaint of injury that results from a use of force contact, to themselves or the suspect, to their immediate supervisor. In the case of extra-duty contacts, each incident shall be reported immediately to the supervisor or area supervisor and the shift commander of the affected division and document as required.

(Doc. 17-6 at 10 (footnote omitted))

(Doc. 17 at 10)  Also, the City "maintains an Internal Affairs . . . Bureau that is assigned to investigate complaints of misconduct."  (Doc. 17 at 9)  The City "utilizes an Early Intervention Program ('EIP')[, which] . . . trigger[s] a secondary supervisory review based on criteria set forth in [Section 651.1, Standard Operating Procedure; w]hen the EIP use-of-force criterion is met, an intervention report is generated listing the offense report numbers for the subject incidents.  The intervention report is then sent to the Major of the officer's assigned District so that the incidents can be reviewed."  (Doc. 17 at 9)

Before November 2008, the Internal Affairs Bureau investigated six use-of-force complaints involving a taser.  (Doc. 17 at 9)  "[F]our . . . had findings that the officer violated the taser policy and [two of the four] resulted in the suspension of the officer."  (Doc. 17 at 9)  One of the six investigations resulted in a "recommendation that the issue be addressed in training."  (Doc. 17 at 9)

Until October 31, 2013, when the City moved for summary judgment (Doc. 17), Tampa officers had "been using the taser for nine . . . years and in that time frame the City . . . [had] been named as a Defendant in three . . . lawsuits (including the current lawsuit) that alleged excessive force related to the taser."  (Doc. 17 at 8)  A 2011 lawsuit was resolved at mediation, and a 2012 lawsuit was pending at the time of the present summary judgment motion.  (Doc. 17 at 8)  Also, in 2008, the City was "sued . . . in connection with a 2004 arrest that occurred at a City Counsel meeting."  (Doc. 17 at 8)  The 2008 lawsuit "was voluntarily dismissed by the Plaintiff."  (Doc. 17 at 8)

# DISCUSSION

*1. Count I: False Arrest*

Hayes sues Miller under Section 1983 for false arrest in violation of the Fourth and the Fourteenth Amendments to the Constitution.  (Doc. 2 at 8-10)  Miller argues that an "officer is entitled to qualified immunity on a § 1983 claim of false arrest where the officer had 'arguable probable cause.'"  (Doc. 16 at 6)  Although Miller dropped the charges against Hayes (battery on a law enforcement officer, resisting arrest without violence, and trespassing (Doc. 16 at 5)), Miller maintains in the motion for summary judgment that he had "arguable probable cause" (1) under Section 871.01, Florida Statutes, "disturbing schools and religious and other assemblies," and (2) under Section 843.02, Florida Statutes, "resisting [an] officer without violence to his or her person."  (Doc. 16 at 7, 10)  Miller argues that, although "[i]t is certainly equally arguable that the Plaintiff battered Officer Miller when he hit him in the nose, in violation of [Section 784.07, Florida Statutes,] . . . this motion is focused on whether [arguable] probable cause had been established for any criminal offense *before* the battery."  (Doc. 16 at 7)

Hayes responds that Miller cannot assert qualified immunity as a defense because Miller "never identified himself to [Hayes] as a police officer."  (Doc. 21 at 17)  Hayes argues that even if Miller can assert qualified immunity, Miller "had not even probable cause to arrest [Hayes] for any offense whatsoever."  (Doc. 21 at 16)  Further, "Hayes was at no time charged with any violation of § 871.01[,] and

its inclusion in Miller's summary judgment motion is but an afterthought by the

Defendants and was not previously plead[ed]." (Doc. 21 at 10)

A police officer has qualified immunity from a false arrest claim if, at the time

of the arrest, the officer had "arguable probable cause to arrest for *some* offense."

*Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013). The standard for arguable

probable cause is "whether a reasonable officer in the same circumstances and

possessing the same knowledge as the officer in question *could* have reasonably

believed that probable cause existed in the light of well-established law." *Gold v. City*

*of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (internal quotation marks omitted).

Section 871.01(1), Florida Statutes, states:

> **Disturbing schools and religious and other assemblies.**
>
> (1) Whoever willfully interrupts or disturbs any school or any
> assembly of people met for the worship of God or for any lawful
> purpose commits a misdemeanor of the second degree, punishable
> as provided in § 775.082 or § 775.083.

An "assembly" under this section includes a town council meeting and a political

rally. *See, e.g.*, *Weidner v. State*, 380 So. 2d 1286, 1286 (Fla. 1980) (discussing an

Interlachen town council meeting); *Carlson v. City of Tallahassee*,

240 So. 2d 866, 866-67 (Fla. 1st DCA 1970) (Spector, J.) (discussing a political rally

held in the municipally-owned Capital Stadium in Tallahassee). The definition of

"assembly" under Section 871.01 encompasses the Code Enforcement Board hearing.

To commit an offense under this section (1) "a person must have deliberately

acted to create a disturbance," (2) "[t]he acts complained of must be such that a

reasonable person would expect them to be disruptive," and (3) "the acts must, in fact, significantly disturb the assembly." *S.H.B. v. State*, 355 So. 2d 1176, 1178 (Fla. 1977). However, "[a]rguable probable cause does not require an arresting officer to prove every element of a crime . . . before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001).

A reasonable officer in Miller's position "*could* have reasonably believed that probable cause existed" under Section 871.01. *See Gold*, 121 F.3d at 1445. Amos notified Miller that Hayes was possibly disrupting the hearing. Miller witnessed Hayes discordantly accusing a neighbor of racism and interfering with Owen's addressing the board.[3] Therefore, because Miller had arguable probable cause to arrest Hayes for disrupting a public assembly, qualified immunity attaches to Miller and defeats Hayes's false arrest claim. Whether Miller had a distinct basis for arguable probable cause under Section 843.02 ("resisting officer without violence to his or her person") is superfluous.

Hayes argues that Miller cannot assert qualified immunity as a defense because Miller "never identified himself to [Hayes] as a police officer." (Doc. 21 at 17) However, whether Miller identified himself as a police officer is inconsequential to the false arrest claim because Miller focuses on arguable probable cause for disturbing

---

[3] Whether Amos "felt concerned" or whether Hayes "frightened" Owen (Doc. 16 at 8, 10) is inconsequential because Amos's and Owen's subjective "feeling" at the time is not an "objective factor[] that gave rise to [Miller's] probable-cause determination." *See Scarbrough*, 245 F.3d at 1303 n.8.

a public assembly, not battery on a law enforcement officer, and because Miller

asserts qualified immunity.  The defendants in *United States v. Feola*, 420 U.S. 671,

686 (1975), and *United States v. Perkins*, 488 F.2d 652, 655 (1st Cir. 1973) – opinions

cited by Hayes – each appeal a conviction for assaulting a federal officer.  *Feola* and

*Perkins* consider whether the officer identified himself because "an honest mistake of

fact would not be consistent with criminal intent."  *Feola*, 420 U.S. at 686.  However,

"[Miller's] motion is focused on whether [arguable] probable cause had been

established for any criminal offense *before* the [alleged] battery" against Miller.  (Doc.

16 at 7)  Also, Hayes is not appealing a conviction; rather, Hayes undertakes to evade

an officer's claim of qualified immunity.  Therefore, even if Miller never identified

himself to Hayes as a police officer, Miller enjoys qualified immunity.

Nevertheless, Miller's alleged failure to identify himself as a law enforcement

officer contributes to determining whether Miller used excessive force.  *See Ortega v.

Schramm*, 922 F.2d 684, 696 (11th Cir. 1991) ("In light of the evidence presented by

the plaintiffs that they could not see who was demanding entry into the filling station

that night, Schramm's failure to identify himself as a police officer and his use of the

shotgun to gain entry, there existed a solid basis for the jury finding of excessive

force.").

Hayes argues that he "was at no time charged with any violation of § 871.01

and its inclusion in Miller's summary judgment motion is but an afterthought by the

Defendants and was not previously plead[ed]."  (Doc. 21 at 10)  Whether Hayes was

"charged with any violation of § 871.01" (Doc. 21 at 10) is immaterial because the issue is "not whether [Hayes's] actions actually constituted a crime." *See Scarbrough*, 245 F.3d at 1303 n.8. Also, although in the answer (Doc. 3) Miller never specified that he had arguable probable cause under Section 871.01, Miller pleaded that "on the date of incident . . . [Miller] was acting in his discretionary authority" and that "the arrest of the Plaintiff was supported by . . . arguable probable cause." (Doc. 3 at 6-7) Rule 8(c)(1), Federal Rules of Civil Procedure, requires a party merely to state affirmatively any "avoidance or affirmative defense" in responding to a pleading. *See Alabama Dep't of Econ. & Cmty. Affairs v. Lett*, 368 Fed. Appx. 975, 978 (11th Cir. 2010) ("We agree that Dr. Lett preserved the Rule 4007(c) defense when he pleaded the statute of limitations in his answer even though the answer contained no specific reference to Rule 4007(c).").

*2. Count II: Excessive Force*

Hayes sues Miller under Section 1983 for use of excessive force in violation of the Fourth and the Fourteenth Amendments to the Constitution. (Doc. 2 at 10-12)

*A. Discrete "Excessive Force" Claim*

Miller argues that because "Hayes contends that no amount of force could be lawfully used against him," the "claim for excessive use of force during an illegal . . . arrest is subsumed in the illegal . . . arrest claim and is not a discrete excessive force claim." (Doc. 16 at 11 (citing *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000))) Hayes fails to respond to this argument.

To the extent that "damages recoverable on [the] false arrest claim include damages suffered because of the use of force in effecting the arrest . . . [, the] excessive force claim is subsumed in his false arrest claim." *Williamson*, 65 F.3d 155, 158-59. Hayes assumes that "any force [Miller] used is constitutionally unreasonable" because "there [was] no need for force." (Doc. 21 at13) However, Hayes explains that, even if Hayes's actions justified some force, Miller used excessive force. For example, Hayes alleges that he never threatened the board, never actively resisted arrest, and never attempted to flee. (Doc. 21 at 10) Rule 8(d)(2), Federal Rules of Civil Procedure, explains, "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Further, to determine whether "force was objectively reasonable by Fourth Amendment standards, courts consider a variety of factors, including . . . the need for the application of force." (Doc. 16 at 13 (quoting *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004))) Therefore, Count II is a discrete claim.

### B. Qualified Immunity

The availability of qualified immunity depends on (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's

alleged misconduct."[4] *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. 194) (citation omitted).

Violation of Constitutional Rights — Hayes and Miller use a different standard to analyze whether Miller deployed excessive force.  Hayes uses *Graham* – "(1) the severity of the crime at issue[,] (2) whether the suspect poses an immediate threat to the safety of the officers or others[,] and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  (Doc. 21 at 9 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)))  In contrast, Miller uses *Whitley* – "To determine if force was objectively reasonable by Fourth Amendment standards, courts consider a variety of factors, including: (1) the need for the application of force, (2) the relationship between the need and amount of force used[,] and (3) the extent of the injury inflicted."  (Doc. 16 at 13 (quoting *Draper*, 369 F.3d at 1277-78))  *See Whitley v. Albers*, 475 U.S. 312, 321 (1986).  Miller uses *Graham* "to determine whether there was a need to use force."  (Doc. 16 at 13)

The Eleventh Circuit employs both *Graham* and *Whitley* (the "*Whitley* test" is also known as the "*Leslie* test").  *See Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) ("*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk

---

[4] "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001))

of flight."); *Lee*, 284 F.3d at 1198 n.7 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536

(11th Cir. 1986)) ("Although this Circuit's [*Leslie*] test previously included a

subjective prong examining whether the force was applied maliciously, this factor has

been eliminated from the analysis by *Graham* and other cases establishing that the

excessive force inquiry should be completely objective, therefore excluding

consideration of the officer's intentions.  The other three elements of the *Leslie* test are

still valid after *Graham*." (citation omitted)); *see also Cockrell v. Sparks*,

510 F.3d 1307, 1311 (11th Cir. 2007) (applying the "*Whitley* test").

     *Graham* and *Whitley* overlap; for example, the "severity of the crime at issue"

might suggest a "need for the application of force."  Further, *Graham* and *Whitley*

each offer a non-exhaustive list; for example, *Graham* requires "careful attention to

the facts and circumstances of each particular case, including" the three *Graham*

factors.  *Graham* constitutes an independent standard to determine whether "the force

used by a police officer in carrying out an arrest [is] reasonably proportionate to the

need for that force."  *Lee*, 284 F.3d at 1198.

     Using either standard, whether Miller violated Hayes's Fourth Amendment

rights is a genuine issue of material fact.  Miller argues that, although Hayes "was

being arrested for a minor offense, . . . his behavior created a belief that he was

resisting arrest."  (Doc. 16 at 14)  "[T]he analysis of use of force is to be viewed from

the perspective of the law enforcement officer . . . [and t]he Constitution does not

require an officer to err on the side of caution."  (Doc. 16 at 14 (citing *Graham*,

490 U.S. at 394; *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1032 (11th Cir. 2001)))
Hayes responds that "it [was] clear that no crime was committed," "[that there was]
no need for the use of any force whatsoever," and that "there was no credible threat –
immediate or otherwise – to the safety of anyone at the Board meeting or to Officer
Miller at any time from Hayes. . . .  Hayes was also not actively resisting arrest or
attempting to flee."  (Doc. 21 at 10)

"The 'reasonableness' of a particular use of force must be judged from the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision of
hindsight." *Graham*, 490 U.S. at 396.  However, an order on summary judgment
must "assum[e] all reasonable inferences in favor of [the non-movant]." *Lippert v.
Cmty. Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir. 2006).

Tasing[5] is not typically a "*de minimis*" force that "is ordinarily accepted during
the process of an arrest" (Doc. 16 at 17-18); the use of a taser requires an officer to
assess "the relationship between the need and amount of force used." *Draper*,
369 F.3d at 1277-78; *see also Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)
("[T]he repeated tasering of Oliver into and beyond his complete physical
capitulation was grossly disproportionate to any threat posed and unreasonable under
the circumstances.").

---

[5] For using "tased" rather than "tasered," refer to *Chambers v. United States*, 2013 WL
4080118, at *1 n.3 (M.D. Fla. Aug. 13, 2013) (Hodges, J.) (choosing "tase" as the verb form of the
noun "taser"); *Reiff v. Marks*, 2011 WL 666139, at *2 n.23 (E.D. Pa. Feb. 23, 2011) (Rufe, J.) (same);
*Williams v. City of Madison*, 2012 WL 113752, at *1 n.2 (S.D. Ill. Jan. 13, 2012) (Herndon, J.) (same).

Assuming all reasonable inferences in favor of Hayes, whether Hayes's behavior justified Miller's use of a taser is a genuine issue of material fact.  For example, Amos testifies that Hayes took a "fighting stance" when Miller deployed the taser (Doc. 16-2 at 12); Wendelin Anderson[6] testifies that Hayes had his back towards Miller when Miller fired the taser.  (Doc. 21-5 at 2)  The parties' conflicting factual allegations, as a whole, create a genuine issue of material fact about Miller's using excessive force against Hayes in violation of the Fourth Amendment.

Clearly Established Law — Miller argues that "in November 2008[,] the clearly established law did not place officers on notice that using the taser under these circumstances and for the reasons cited by Officer Miller violated the Fourth Amendment."  (Doc. 16 at 13)  Miller draws a parallel between this action and Draper, 369 F.3d 1270; like the plaintiff in Draper, Hayes "committed a minor offense, but his stance, demeanor and facial expressions led Officer Miller to believe that [Hayes] was resisting arrest and the resistance was likely to escalate."  (Doc. 16 at 12)

Hayes fails to directly respond to this argument.  However, in the complaint, Hayes argues that the "district and circuit court decisions established and available to Miller at the time of Hayes's arrest . . . clearly held that the multiple applications and use of a Taser on unarmed, non-violent and non-resistant individual constitutes a violation of the constitutional rights of the subject."  (Doc. 2 at 8)  Further, in the response to Miller's summary judgment motion, Hayes cites (Doc. 21 at 12) a portion

---

[6] Anderson is a "senior code enforcement support technician for the Code Enforcement Division and with the City Clerk's office."  (Doc. 21-5 at 2)

of *Brown v. City of Golden Valley,* 574 F.3d 491, 499 (8th Cir. 2009) (citation omitted), which states:

> At the time Zarrett deployed his Taser and arrested Sandra, the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator.

In the second prong of the *Saucier* two-part analysis, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  533 U.S. at 202.  "This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have agreed upon the precise formulation of the standard. . . .  [T]he officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard."  *Saucier,* 533 U.S. at 202-03; *see also Pearson,* 555 U.S. at 245 (holding that "where the divergence of views on the consent-once-removed doctrine was created by the decision of the Court of Appeals in this case, it is improper to subject petitioners to money damages for their conduct").

Miller argues that, because in *Draper* the plaintiff's "stance, demeanor and facial expressions" justified the officer's use of a taser, holding otherwise in this factually similar action would create a "divergence of views."  *See Pearson,* 555 U.S. at 245.  However, construing the record as a whole in favor of Hayes, whether Hayes's "stance, demeanor and facial expressions" justified Miller's use of a

taser is a genuine issue of material fact. Simply stated, Hayes's "stance, demeanor, and facial expression" and the attendant circumstances present a genuine issue of material fact. If Hayes was not resisting, not violent, not fleeing, and not threatening, established law requires a different result than if he was one or more of these – to a sufficient extent.

### 3. Count III: Assault and Battery

Hayes sues Miller under Florida state law for assault and battery. (Doc. 2 at 12-13) Miller argues that, because he acted within "the course and scope of his employment as a police officer" and because he never "act[ed] in bad faith," qualified immunity shields Miller if "the Court grants summary judgment on the constitutional claims in Count I and Count II." (Doc. 16 at 16) Hayes fails to respond to this argument.

Section 768.28(9)(a), Florida Statutes, states:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . .

As the employer, the City is the proper subject of Hayes's tort claim unless (1) Miller acted "outside the course and scope of . . . his employment," (2) Miller committed the alleged tort "in bad faith," (3) Miller committed the alleged tort "with malicious

purpose," or (4) Miller committed the alleged tort "in a manner exhibiting wanton and willful disregard of human rights safety, or property."

"There is no dispute that . . . Miller was acting within the course and scope of his duties as a law enforcement officer [during the event in question] on November 26, 2008."  (Doc. 16 at 17)  However, whether Miller committed the alleged tort "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" "form part of the same case or controversy" as Hayes's Fourth Amendment excessive force claim (Count II), *see* 28 U.S.C. § 1367; the federal excessive force claim and the state tort claim each turn on whether the respective law justifies Miller's using the taser to facilitate Hayes's arrest.  Both the federal and the state claims survive summary judgment. Because the federal claim survives summary judgment, under Section 1367, this court exercises supplemental jurisdiction over the state claim.

*4. Count IV: Failure to Implement and Enforce Appropriate Policies, Customs, and Practices*

Hayes sues the City under Section 1983 for "failure to implement and enforce appropriate policies, customs, and practices."  (Doc. 2 at 13)  "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

*A. Violation of Constitutional Rights*

Because a reasonable officer in Miller's position could have reasonably believed that probable cause existed under Section 871.01, Miller is entitled to qualified immunity against a false arrest claim.  However, on summary judgment, Miller is not entitled to qualified immunity against Hayes's excessive force claim. The Fourth Amendment excessive force claim satisfies the first element of Hayes's claim against the City.

*B. The City's Deliberate Indifference*

The City analyzes this second element in two steps – Hayes must show (1) that "the City knew before November 2008 that there was a widespread practice of using excessive force by Tampa officers" and (2) that "the City took no action in response to this knowledge."  (Doc. 17 at 6)

Miller's History — Applying these steps to Miller, Hayes must show (1) that the City knew Miller "had exhibited questionable judgment in the past" (Doc. 21 at 14; Doc. 17 at 6) and (2) that "the City took no action in response to this knowledge" (Doc. 17 at 6).  Hayes argues that, although Miller is "an officer with a documented history of using excessive force against a nonresisting suspect and who was disciplined for having discharged his Taser 167 times in less than two years," the City allowed Miller to "use only his own personal subjective judgments as to when someone can be removed from a public hearing and . . . the level of force that can be used."  (Doc. 21 at 14-15)  Further, the City "did not discipline or counsel Miller . . .

- 19 -

after the Hayes arrest," which can "constitute 'deliberate indifference or tacit authorization of the offensive acts.'"  (Doc. 21 at 15 (quoting *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012) (Martinez, J.)))  The City responds that "the raw data from the taser is insufficient to demonstrate that there is any issue with [Miller]'s taser use or that there is a systematic problem at [the City's] police department."  (Doc. 17 at 8)

Although the data from the taser "cannot indicate whether the taser was being test fired or deployed against a subject" (Doc. 17 at 7), the 2006 investigation and subsequent disciplinary action against Miller could have put the City on notice that Miller has a history of exercising questionable judgment.  However, the City "took . . . action in response to this knowledge." (Doc. 17 at 6)  In 2006, the City conducted internal affairs investigations and disciplined Miller.  Since then, "Miller has not received any Internal Affairs complaints." (Doc. 17 at 7)

Further, even if no rules exist specifically for public hearings, Miller is required to comply with Section 521.2, Standard Operating Procedure, the City's policy on tasers; Section 1601, Manual of Regulations, which prohibits excessive force; Section 1602, Manual of Regulations, which requires officers to report use of force; and Section 538, Standard Operating Procedures, which requires "the use of force in any situation be limited to the force, which is needed to overcome specific resistance by the subject." (Doc. 17-7 at 1)  Also, Miller "received continued taser training in 2006, 2007, 2008, 2010, and 2011." (Doc. 17 at 12)  Although Hayes argues that

"[c]ompounding that situation is the fact that [the City] did not discipline or counsel Miller or take any meaningful action after the Hayes arrest" (Doc. 21 at 15), in advancing his argument, Hayes assumes that Miller used excessive force, which Miller disputes in Count II.

In sum, although the City knew Miller "had exhibited questionable judgment in the past" (Doc. 21 at 14), the City "took . . . action in response to this knowledge" (Doc. 17 at 6).  The City's action negates an inference of "deliberate indifference."

Unconstitutional Custom or Policy — Applying the City's two steps to Tampa officers in general, Hayes must show (1) that "the City knew before November 2008 that there was a widespread practice of using excessive force by Tampa officers" and (2) that "the City took no action in response to this knowledge."  (Doc. 17 at 6) Hayes argues that because the City "has adopted an unconstitutional custom or policy of allowing its officers unfettered and uncontrolled discretion to determine what speech or conduct . . . will be allowed or not allowed at a public hearing," an officer has "the unrestricted discretion to use whatever level of force he desires, including Tasers."  (Doc. 21 at 15)  The City responds that the "minimal number of lawsuits related to taser use demonstrates the absence of a widespread trend of unfettered and unlawful taser use."  (Doc. 17 at 8)

The second element a plaintiff must show to impose Section 1983 liability on a municipality is "that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right." *McDowell*, 392 F.3d at 1289.

- 21 -

In other words, Hayes must show that the City had a custom or policy allowing

Tampa officers to use excessive force.  However, Hayes narrows the interpretation of

this element to whether the City has a policy "to guide or instruct its officers as to

what circumstances would justify the forced eviction of a citizen participant from the

public hearings or what level of force should be employed in doing so."  (Doc. 21

at 14)  This standard is unduly narrow.  The City maintains a taser policy (Section

521.2, Standard Operating Procedure) and a policy against use of excessive force

(Sections 1601 and 1602, Manual of Regulations, and Section 538, Standard

Operating Procedures), which together are sufficient to prove that the City lacked a

custom or policy allowing Tampa officers to use excessive force.

Further, to the extent that lawsuits and use-of-force complaints against the City

suggest actual wrongdoing, the number of lawsuits and complaints is sufficiently

sparse to preclude the existence of a policy of widespread, unfettered, and unlawful

taser use.  Also, the few times an officer violated the City's taser policy, the City

sanctioned the officer rather than endorse the behavior.

*C. The City's Deliberate Indifference Causing the Violation*

Because the City lacks a custom or policy that constitutes deliberate

indifference to Hayes's Fourth Amendment right, analysis of whether this

indifference caused the violations to this right is unnecessary.

## CONCLUSION

Miller's motion (Doc. 16) for summary judgment is **GRANTED** on Count I

(false arrest).  Miller's motion (Doc. 16) on Count II (excessive force) and on

Count III (assault and battery) is **DENIED**.  The City's motion (Doc. 17) for

summary judgment is **GRANTED**.

ORDERED in Tampa, Florida, on October 1, 2014.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE